UNITED STATES, to Use and for Benefit of FOSTER WHEELER CORPORATION, v. AMERICAN SURETY CO. OF NEW YORK.

### ATLANTIC BASIN IRON WORKS v. UNITED STATES.

#### No. 7674.

District Court, E. D. New York.

July 22, 1940.

Kamen & Ostertag, of New York City (Bernard I. Kamen, of New York City, of counsel), for Foster Wheeler Corporation.

Harold M. Kennedy, U. S. Atty., of Brooklyn, N. Y. (Mario Pittoni, Asst. U. S. Atty., of Lynbrook, N. Y., of counsel), for the United States.

Bigham, Englar, Jones & Houston, of New York City (W. J. Nunnally, Jr., and H. J. Bogatko, both of New York City, of counsel), for American Surety Co. of New York and Atlantic Basin Iron Works.

GALSTON, District Judge.

This is an action brought pursuant to the Miller Act, U.S.C. Title 40, Sec. 270b, 40 U.S.C.A. § 270b (formerly known as the Hurd Act) by a sub-contractor to recover an alleged balance due it from the general contractor.

The suit was begun by the Foster Wheeler Corporation against the American Surety Company. From the complaint it appears that on November 27, 1936, the Atlantic Basin Iron Works entered into a contract with the United States for furnishing and installing new boilers, renewal of tank tops, and general above water repairs for the United States Army Transport Republic. Pursuant to that contract the Atlantic Basin Iron Works furnished a payment bond with a surety for the protection of a person supplying labor and material in the prosecution of the contract. The bond was executed by the defendant, American Surety Company of New York, in the usual form in such cases made and provided. The general contractor thereupon contracted with the plaintiff for boilers, materials and labor which it is alleged were duly supplied by the plaintiff. The agreed price for the boilers and services was $96,128.49; the contractor paid on account thereof the sum of $90,513.20, leaving unpaid $5,616.29.

By its answer, making denial of material allegations, the defendant Surety Company raised the general issues. Thereafter the Atlantic Basin Iron Works intervened as a defendant, and by an amended answer set up a counterclaim alleging that the boilers and appurtenances supplied by the plaintiff were not in accordance with the specifications; and that the Atlantic Basin Iron Works was compelled to make repairs

after notice to the plaintiff at a cost of $11,365.48, and accordingly seeks judgment in that amount against the Foster Wheeler Corporation.

The United States of America, as third party defendant, alleges that all the work and labor performed on or about October 12, 1937, in repairing the boilers on board the United States Army Transport Republic, was by virtue of the contract between the parties required to be done without any additional cost or expense; and as a counterclaim owing to the failure of the defendant, Atlantic Basin Iron Works, to repair or replace the defects in the brick work which developed within the year's guarantee, seeks a recovery against the defendant and the third party plaintiff in the sum of $8,135.77.

The issue can be narrowly stated. On the one hand the plaintiff contends that it complied fully with the terms of the contract; on the other, the United States contends that within one year from the date of completion of the contract the furnaces failed; that in consequence the general contractor, having guaranteed the equipment furnished against defective materials and workmanship, was under obligation to replace by supply of new part or otherwise remedy the defect without cost to the United States Government; and the Atlantic Basin Iron Works in turn looks to the Foster Wheeler Corporation, under the terms of the contract between those two corporations, for failure to comply with the terms of the contract between them.

Moreover, the position of the Foster Wheeler Corporation is that the collapse of the furnaces was owing not to any fault on its part, but on the contrary to improper operation of the boilers by the crew of the United States Army Transport Republic.

In the stipulation signed by the parties it appears that the only items in the Government's specifications claimed by the defendants not to have been performed duly by the Foster Wheeler Corporation relate to

(a) The type, trade name and specifications of the fire brick and refractory furnished and installed;

(b) The means employed for tying in place the furnace walls;

(c) The type, tradename, etc., of tie brick used for tying in place the furnace walls;

(d) The design and specifications of the tie bolts used for tying in place the furnace walls; and

(e) The number of tie bolts used for tying in place the furnace walls.

The stipulation recites that the foregoing items are covered by the following extracts of the specification.

(1) Government Contract W 626 q m-22097.

"Suitable tie brick with high temperature alloy steel tie bolts shall be supplied for supporting front and back walls."

"All fire brick and fire tile shall conform to class SH 75 of Federal Specifications Board, specifications for fire clay brick No. HH–B–671a, and in addition thereto, shall pass the Navy simulated service test with a work factor rating of not less than 1.7."

(2) Foster Wheeler Specification.

"The furnace walls will be tied in place with a suitable number of high temperature alloy steel tie bolts and special tie brick."

"All refractory will be Garfield 'Corstex' and conform to Class SH 75 of Federal Specifications Board, specifications for fire clay brick No. HH–B 671 n and also shall pass the Navy simulated service test with a work factor of not less than 1.7."

It is agreed that the four boilers were manufactured, furnished and installed by and under the supervision of the Foster Wheeler Corporation and that the work was completed and accepted by the Government on May 20, 1937. It appears that between that time and July 25, 1937, the Republic made one round trip from Brooklyn to Honolulu without incident; that on August 4, 1937, the Republic proceeded on another voyage to Honolulu, but on the return, when about two days out of Panama, the rear furnace wall of boiler No. 3 collapsed. Repairs of that boiler were made at the Canal Zone. On arrival from Panama at Brooklyn, on October 10, 1937, the rear furnace wall of boiler No. 1 collapsed. An examination at the time revealed also bulging in the rear walls of boilers Nos. 2 and 4.

The Foster Wheeler Corporation was requested to make the necessary repairs; and on refusal, the repairs were made by the Mack Company and paid for by the Atlantic Basin Iron Works. Thereafter the vessel made two voyages to Honolulu and return, following which, in March, 1938, an inspection of the four boilers revealed that to make the vessel seaworthy further re-

pairs were necessary. The refusal of the Atlantic Basin Iron Works to re-brick the furnaces forced the United States to have repairs made in boilers Nos. 1, 2 and 4, and subsequently to re-brick boiler No. 3.

Our first inquiry must be to determine whether the fire brick and fire tile supplied by the plaintiff conformed to the specification. The proceedings at the meeting of the Board of Inquiry appointed by the superintendent of Army Transport Service to investigate the failure of the furnaces disclosed that the brick removed from boilers Nos. 1, 2 and 4 in March, 1938, included bricks bearing the trademarks Corstex, Mexko, Mullitex, Armor, and various miscellaneous broken brick. This variety included brick used in the original installation and brick used in the repairs of October, 1937. The Mack Engineering Supply Company had furnished the brick for the October, 1937, repairs. Their bill shows that only Mexko bricks were supplied by them.

A report of the National Bureau of Standards, on a test of samples of fire clay brick, made April 12, 1938, discloses that Mexko brick and Mullitex brick conform to Government specifications, but that neither the Corstex brand of fire clay brick nor Arch 3441 supplied, comply with the p c e requirement specified for the high heat duty class (formerly in the SH–75) of fire clay brick. Thus it would seem that the failure of Corstex and of the Arch brick to meet specifications worked a breach of the contract. The failure of the bricks, as indicated by very considerable evidence of spalling, may well have been caused by the inferior quality of the brick supplied.

But more important than the quality of the brick is the question of the manner in which the back walls were held in place. The contract between Foster Wheeler Corporation and the Atlantic Basin Iron Works provided that the "furnace walls were to be tied in place with a suitable number of high temperature alloy steel tie bolts and special tie bricks." It is to be noted that the specific number of such tie bolts was not specified and what was a "suitable" number was therefore an open question, left to the judgment of the Foster Wheeler Corporation. They assumed the risk in determining upon the number, for failure within the year due to an insufficiency would subject the Foster Wheeler Corporation to the obligation to re-furnish or re-supply. Egsieker, an engineer associated with the Foster Wheeler Corporation, explained the construction of these boilers. A 9-inch brick lining was provided backed with insulation and a steel casing. Welded into the back of the steel casing on the interior, i. e., the furnace side, were small angle clips, into which were inserted the hook or anchor bolts, the free end of the anchor bolt being inserted into the tie brick. According to Foster Wheeler plans thirty-two of such anchor bolts were to be provided in the rear wall of each boiler and twenty-five in each side wall. The estimated area of each rear wall was about 90 square feet, the furnace being 10 feet wide and the rear wall being about 9 feet high. The anchor bolts were placed at centers 3 feet apart horizontally, and at $10\frac{1}{16}$ inches vertically, in staggered relationship, i.e., staggered in the two rows. The approximate weight of the rear wall of these boilers was about 11,250 pounds. The witness admitted that no mathematical calculation could be made to support the use of but thirty-two tie bolts for the rear walls. He said: "I think I can best explain it by saying that that is the specification that we have used on a great many boilers of this kind and which has proven satisfactory." And again: "I don't think you could make a mathematical calculation of that to find out just how many bolts you need. It is entirely possible. That specification of bolts has been used in past years and as your experience increases we set up a standard for that. I don't think you can calculate how many bolts you need. It is just—that there is no load on the bolt, really." He also admitted that the rolling and pitching of a ship at sea would have considerable effect on the wall and that the tie bolts were used to meet just that condition. He added: "If the boiler was stationary we would not need them."

Though the design of the boilers called for thirty-two tie bolts in the rear walls, when the rear wall in boiler No. 3 was taken out only twenty-eight anchor bolts were found. This same number were found in the rear walls of the other three boilers. Why only twenty-eight tie bolts were used instead of thirty-two, as called for by the design, is not explained. It is significant that in making repairs in Panama of the rear wall of boiler No. 3, engineer Kracke used fifty-six tie bolts, at which time the repairs were under governmental direction.

In the repairs made in October, 1937, by the Atlantic Basin Iron Works, however, the same type of anchorage and the same

number of tie bolts were used as in the original installation. When the walls were examined in March, 1938, it was found that while the rear walls of boilers Nos. 1, 2 and 4 had again bulged, in the rear wall of boiler No. 3, in which twice the number of anchor bolts had been inserted, no bulging appeared.

It would seem a fair inference, therefore, that the plaintiff had submitted a design which yielded an insufficient number of tie bolts.

It is to be observed also that the heat in the boilers exceeded the heat resistant limitation of the bolts. The boilers generated heat from 2,500 degrees to 2,800 degrees Fahrenheit. Plaintiff's metallurgist, Holder, admitted: "As your temperature goes up your tensil strength falls, but it has certain physical characteristics at elevated temperatures which are quite high and the exact figures I cannot recall, but you do have good tensil at about 1500, 1800, but your physical, as far as that is concerned, as your temperatures go up they are lowered." Thus it would seem that though the tie bolts furnished by the plaintiff were of "high temperature alloy steel" they were not adapted to sustain the higher temperature which the furnaces generated.

As against the government's contention that the brick was defective and an insufficient number of tie bolts provided, the plaintiff sought to prove that the failure of the furnaces was due to the improper operation of the boilers. It appears that the witness Peattie, a service engineer employed by the plaintiff, was present on the test trip, and also on the first voyage of the steamship Republic to San Francisco. He asserted that it was obvious that the equipment was new to the firemen and that they were not familiar with the proper operation of the boilers and the burners. He said that while at sea, when the oil supply was shut off to enable the burners to be changed or cleaned, the firemen failed to close the air registers supplying air to the burners. He ascribed the failure of the brick to the sudden shift in temperatures thus brought about. The plaintiff also claims that the condition of the burner tips and flame cone, when examined in October, 1937, disclosed that there had been improper combustion.

But Peattie told Kracke that he was perfectly satisfied with the operation of the boilers and indeed he testified that when the Republic returned to Brooklyn from the first voyage, he and Tierney went into the furnace, made an examination of the brick, burners, registers, tubes, brick work and walls, and found "they were in excellent condition with no exceptions at all." By excellent condition he meant, he explained, "there were no signs of spalling or cracking of the brick, or any slagging off of the face of the brick. The arches were up to their original shape; i.e. they weren't broken away or cracked away, and the furnace floor did not have any heavy slags, any heavy deposits over them or anything like that. It was the way we would like to see a boiler after that length of steaming time." If there had been neglect by the firemen and careless operation of the burners such as Peattie complained of on this first voyage, some evidence thereof should have been observable to him at the conclusion of the first round trip voyage to Honolulu. Tierney, a sales and service engineer employed by the Foster Wheeler Corporation, also made an inspection at the conclusion of the first trip in July, and he too admitted that he found the brick work in the boilers in excellent condition. Moreover, Kracke and Donnally both contradict Peattie and deny that they received any complaints that the crew's operation of the boilers was faulty. The weight of the testimony is that if the boilers had been improperly operated so as to cause improper combustion of oil and air, the presence of smoke would have been shown in the indicators. Peattie admitted that he found no excessive smoke. Donnally, now chief engineer of the Army Transport Republic, but up to 1938 first assistant engineer, testified there were no unusual smoke conditions at any time.

It must be concluded, then, that the collapse of the walls was due in part to defective brick and to the failure to supply a sufficient number of tie bolts. It follows, therefore, that the United States of America is entitled to recover from the American Surety Company and the Atlantic Basin Iron Works the sum of $5,800 for the cost of the necessary repairs. The Atlantic Basin Iron Works has a right of recovery against the Foster Wheeler Corporation for the amount of $2,936.08, the cost of repairs made by it in October, 1937, as well as for the $5,800, the cost of repairs made by the United States of America, in all, the sum of $8,736.08.

On the other hand, the Foster Wheeler Corporation is entitled to be credited with the cost of the materials sup-

plied under the contract, namely, $5,418.39, in accordance with the certificate of completion furnished by the Government engineer; and so too against the amount of the cost of the Government's repairs of $5,800 there must be deducted any sum unpaid under the contract with the Atlantic Basin Iron Works relating to the matter in controversy. The proof fails to disclose the facts in that regard and may be stipulated.

Judgment will be entered in accordance with the foregoing opinion.